MATTHEW C. LOVELL (SBN: 189728)
mlovell@nicolaidesllp.com
B. NATALIE VU (SBN: 273219)
nvu@nicolaidesllp.com
NICOLAIDES FINK THORPE
MICHAELIDES SULLIVAN LLP
101 Montgomery St., Suite 2300
San Francisco, CA 94104
Telephone: (415) 745-3770

Attorneys for Plaintiff
IRONSHORE INDEMNITY INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| IRONSHORE INDEMNITY INC.<br><br>Plaintiff,<br><br>v.<br><br>KEENAN & ASSOCIATES<br><br>Defendant. | Case No.<br><br>**IRONSHORE INDEMNITY INC.'S COMPLAINT** |

Plaintiff Ironshore Indemnity Inc. ("Ironshore Indemnity"), by and through its undersigned counsel, brings this Complaint for Declaratory Relief against Defendant Keenan & Associates ("Keenan"), and states as follows:

**<u>INTRODUCTION</u>**

1. Ironshore Indemnity brings this action to secure a declaration that Ironshore Indemnity is barred from indemnifying – and therefore owes no duty to indemnify – Keenan, for amounts awarded against Keenan in a lawsuit filed in the California Superior Court for the County of Santa Cruz, titled *Braulio Ruvalcaba v. Santa Cruz City Schools et al.*, Case No. 19-CV-00488 (the "Underlying

Action"), or any settlement paid by or on behalf of Keenan to resolve Keenan's liability for the damages awarded against Keenan in the Underlying Action, on the basis that California Insurance Code Section 533 ("Section 533") and California public policy bar indemnification of an award or subsequent settlement based on the willful acts of the insured.

**PARTIES**

2. Plaintiff Ironshore Indemnity is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Illinois, with a principal place of business in the Commonwealth of Massachusetts. At all relevant times, Ironshore Indemnity was licensed and admitted to do business in the State of California.

3. Defendant Keenan is, and at all relevant times was, a California corporation with its principal place of business in Torrance, California.

**JURISDICTION AND VENUE**

4. Ironshore Indemnity files this action in this Court on the basis of diversity of citizenship.

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332(a)(1), because there is complete diversity between Ironshore Indemnity on one hand, and Keenan, on the other, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this court under 28 U.S.C. § 1391(b)(2) as the judicial district in which a substantial part of the events giving rise to this litigation occurred, given that Keenan is headquartered in the Central District.

7. Ironshore Indemnity files this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 and Federal Rules of Civil Procedure, Rule 57, to resolve an actual controversy concerning the rights and obligations of the parties under insurance policies issued to Named Insured The AssuredPartners Group GP, LLC ("AssuredPartners") with respect to the Underlying Action. For purposes of

this lawsuit, Keenan – a subsidiary of AssuredPartners – is an "insured" under each of the insurance policies identified below.

## **GENERAL FACTUAL ALLEGATIONS**

### **The Policies**

8. Ironshore Indemnity issued Excess Financial Institutions Professional Liability policy number 001767106 to Named Insured AssuredPartners, for the policy period October 1, 2019 to October 1, 2020 (the "Ironshore Indemnity Policy"). An authentic copy of the Ironshore Indemnity Policy (with premium information redacted) is attached as **Exhibit A**.

9. The Ironshore Indemnity Policy identifies as the "Followed Policy" the Insurance Agents and Brokers Professional Liability Policy No. 0307-7977 issued by Allied World Insurance Company ("Allied"), for the policy period October 1, 2019 to October 1, 2020, with limits of $15,000,000. The Followed Policy is the first of two insurance policies underlying the Ironshore Indemnity Policy. An authentic copy of the Allied Followed Policy (with premium information redacted) is attached as **Exhibit B**.

10. MAIC issued excess follow form policy number MKLM7PL0001803 to AssuredPartners for the policy period October 1, 2019 to October 1, 2020 (the "MAIC Policy").

11. The MAIC Policy provides excess coverage over the Followed Policy with an aggregate limit in the amount of $10,000,000 excess of $15,000,000.

12. The Ironshore Indemnity Policy provides an aggregate limit of $10,000,000 excess of the total $25,000,000 limits of the Followed Policy and the MAIC Policy.

13. The Ironshore Indemnity Policy follows in many respects the Allied Followed Policy, and includes the following pertinent provisions:

\\\

\\\

**I. INSURING AGREEMENT**

> … [T]he Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy, except as may be otherwise provided in this Policy.

**II. LOSS PAYABLE PROVISION**

> … [T]he Insurer shall pay the Insured as defined in the Followed Policy for Loss by reason of exhaustion by payments of all Underlying Policy Limits of all underlying policies by the underlying insurers … and/or the Insureds, subject to i) the terms and conditions of the Followed Policy …; ii) the Limit of Liability as stated in Item 6 of the Declarations; and iii) the terms and conditions of, and the endorsements attached to, this Policy. In no event shall this policy grant broader coverage than would be provided by the Followed Policy.
>
> …

**III. DEFINITIONS**

…

B. The term "Insureds" means those individuals and entities insured by the Followed Policy.

…

**IV. POLICY TERMS**

A. This policy … has the same terms, definitions, conditions, exclusions and limitations (except as regards the premium, the limits of liability, the policy period and as may be otherwise in this Policy) as are contained in the Followed Policy.

...

D. Notwithstanding any of the terms of this policy which might be construed otherwise, this policy shall drop down only in the event of reduction or exhaustion of the Underlying Limit and shall not drop down for any other reason …

14. The MAIC Policy follows form to the Allied Followed Policy, and states in part:

> **SECTION I — INSURING AGREEMENT**
>
> ... Liability shall attach to the Insurer only after the insurers of the **Underlying Insurance**, [or] the **Insureds** … pay in legal currency as loss covered under the **Underlying Insurance** the full amount of the **Underlying Limit**. The Insurer's maximum aggregate liability for all **Loss** covered under this Policy shall be the Aggregate Limit Of Liability as stated in Item **3.** of the Declarations.

15. The MAIC Policy does not indemnify the insured until there has been payment in full of the Underlying Limit for a covered **Loss**.

16. The Allied Followed Policy contains the following pertinent provisions:

> **I. INSURING AGREEMENTS**
>
> A. **Liability Coverage**
>
> The **Insurer** shall pay on behalf of the **Insured**, **Loss** from any **Claim** first made against the **Insured** during the **Policy Period**, or any applicable Extended Reporting Period, and reported to the **Insurer** in accordance with Section IV.G. of this Policy, for … any of the following **Wrongful Acts**, which take place on or after the Retroactive Date:
>
> 1. **Professional Services Wrongful Act**;
>
> …
>
> In addition to the Limit of Liability set forth in Item 3.A.1. of the Declarations, the **Insurer** shall have the right and duty to defend any **Claim** under this Insuring Agreement which is covered in whole or in part, even if such **Claim** is groundless, false or fraudulent ...
>
> * * *
>
> **II. DEFINITIONS**
>
> G. **Claim** means any:
>
> …
>
> 2. civil proceeding in a court of law; [or]

3. administrative proceeding …

made against any **Insured** seeking to hold such **Insured** responsible for damages for a **Wrongful Act** ...

…

**O. Insured** means any of the following:

1. the **Named Insured** listed in Item 1. of the Declarations; [or]

…

5. any **Subsidiary** that was created or acquired on or before the Inception Date of this Policy…

…

Q. **Loss** means[1] monetary damages, pre-judgment interest, post-judgment interest, judgments, settlements, punitive or exemplary damages where insurable under applicable law or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**.

For the purpose of determining the insurability of punitive or exemplary damages, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction:

a. is the location of the court which awarded or imposed such punitive or exemplary damages; or

b. is where the **Named Insured** is incorporated or otherwise organized or has a place of business; or

c. is where the **Insurer** is incorporated or has its principal place of business.

**Loss** shall not include:

1. **Defense Expenses**;

...

[1] The **Followed Policy** definition of "Loss" is amended by Endorsement No. 28, Amend Definition of Loss. The definition of **Loss** quoted here is the definition as amended by Endorsement 28.

4. the multiplied portion of any multiple damage award; [and]

...

8. amounts not insurable under applicable law.

…

CC. **Professional Services** means[2] insurance services performed for others, for a fee, commission or other consideration, as an insurance agent, insurance broker, insurance consultant, general agent, managing general agent, managing general underwriter, program administrator, surplus lines broker, wholesale broker, insurance claims appraiser, claims handler or claims adjuster, risk manager, notary and premium financier[, and] services performed for others for a fee or a commission as a third party administrator, including claims appraisal, management, adjusting, administration and subrogation services.

…

DD. **Professional Services Wrongful Act** means any actual or alleged act, error, misstatement, misleading statement, omission, neglect or breach of duty committed by an **Insured** in the performance of or failure to perform **Professional Services**.

…

KK. **Subsidiary** means[3] any entity during any time which the **Insured**:

1. owns more than fifty percent (50%) of its outstanding voting shares, partnership interest or member units;
2. controls, directly or indirectly, the right to elect or appoint more than fifty percent (50%) of such entity's directors or trustees; or

---

[2] This definition is amended by Endorsement No. 11. The definition of Professional Services quoted here reflects the text as amended by Endorsement 11.

[3] The **Followed Policy** definition of "Subsidiary" is amended by Endorsement No. 29, the Subsidiary Coverage Endorsement. The definition of "Subsidiary" included here is the definition as amended by this endorsement.

3. has sole control over the management and operations of the entity through a written agreement.

…

LL. **Wrongful Act** means a **Professional Services Wrongful Act** …

**The Underlying Action and Resulting Jury Verdicts**

17. On March 30, 2020, Mr. Ruvalcaba filed the First Amended Complaint ("FAC") in the Underlying Action against Keenan and Santa Cruz City Schools (the "District") in the Superior Court of Santa Cruz County alleging the following causes of action against all defendants (except as noted): (1) disability discrimination under California Government Code ("Gov. Code") § 12940(a); (2) failure to accommodate under Gov. Code § 12940(m); (3) failure to engage in a good-faith interactive process under Gov. Code § 12940(n); (4) failure to prevent discrimination under Gov. Code § 12940(k) (against the District only); and (5) wrongful termination in violation of public policy. An authentic copy of the FAC in the Underlying Action is attached as **Exhibit C**.

18. The FAC alleged that Keenan's and the District's conduct was "willful, knowing, and intentional," and, generally, that they "knowingly and willfully conspired to do the acts and things" at issue in the Underlying Action.

19. The FAC further alleged Keenan "engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff."

20. The Underlying Action went to trial and, following trial, the jury returned verdicts against Keenan on May 23 and May 24, 2022. The verdicts against Keenan totaled $6,908,000 for compensatory itemized damages related to emotional distress and $27,600,000 in punitive damages.

21. The jury completed a Verdict Form in connection with its awards in the Underlying Action. An authentic copy of the Verdict Form is attached as **Exhibit D**.

\\\

22. Regarding the jury's finding of Keenan's intentional conduct, the jury answered "Yes" in response to the following questions on the verdict form:

1. Do you find that: (i) Keenan was aware that the District planned to discriminate against, fail to accommodate, fail to engage in the interactive process with, wrongfully terminate, and/or fail to rehire Mr. Ruvalcaba; and (ii) Keenan agreed with the District and intended that one or more of these wrongful act(s) be committed.

   Yes ___X____ No________

2. Do you find that any one or more of the following is true:

   a. Keenan knew the District was discriminating against Mr. Ruvalcaba, failing to accommodate him, failing to engage in the interactive process with him, wrongfully terminating him, and/or refusing to rehire him, and gave substantial assistance or encouragement to the District to so act;

   b. Keenan gave substantial assistance to the District's wrongful act(s) and Keenan's own conduct, separately considered, constitutes a breach of duty to Mr. Ruvalcaba;

   c. Keenan incited, compelled, or coerced the District to commit the wrongful act(s);

   and/or

   d. Keenan attempted to do any of the foregoing.

   Yes ___X____ No________

The Verdict Form further provides that in the event of a "yes" answer to Question 2, the jury was instructed to circle all subsections they found applicable. The jury circled all four subsections: A through D.

23. Keenan appealed the judgment entered after the above verdict.

24. On information and belief, Allied defended Keenan in the Underlying Action under the Followed Policy, and through the appeal.

25. Keenan has reached a settlement in principle with the underlying plaintiff (Mr. Ruvalcaba).

\\\

**Ironshore Indemnity's Coverage Position**

26. On July 29, 2022, Ironshore Indemnity issued a position letter to Keenan concerning Keenan's claims for insurance coverage under the Ironshore Indemnity Policy for amounts awarded against Keenan in the Underlying Action.[4] That letter reserved rights to deny coverage: (1) to the extent the jury found that Keenan acted willfully, and (2) for any punitive damages.

27. Ironshore Indemnity contends that it is barred from paying amounts awarded against Keenan in the Underlying Action and/or to be paid by Keenan pursuant to a settlement with the plaintiff in the Underlying Action. This prohibition stems from California's fundamental public policy against insuring "the willful acts of the insured," as expressed in Section 533 and supporting case law.

**CAUSE OF ACTION**

(For Declaratory Relief that Ironshore Indemnity Is Barred from Indemnifying Keenan for Amounts Awarded Against Keenan in the Underlying Action or Paid in Settlement of the Underlying Action)

28. Ironshore Indemnity hereby incorporates and realleges all the foregoing paragraphs as though fully set forth herein.

29. Section 533 provides that "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." This statutory provision is an implied exclusionary clause read into all insurance policies under California law.

30. The jury in the Underlying Action found that Keenan's willful acts gave rise to Keenan's liability to Mr. Ruvalcaba. As a result of the jury's findings that Keenan's willful conduct caused Mr. Ruvalcaba's damages, California public policy and Section 533 preclude any obligation on the part of Ironshore Indemnity

---

[4] That letter incorrectly designated the underwriting company as "Ironshore Specialty Insurance Company" rather than Ironshore Indemnity Inc., but in all respects, that letter addressed Keenan's claim for coverage under the terms of the Ironshore Indemnity Policy as defined above.

to indemnify Keenan for the amounts awarded in the Underlying Action, or to be paid in settlement to Mr. Ruvalcaba.

31. An actual controversy has arisen and now exists between Ironshore Indemnity and Keenan, in that Ironshore Indemnity contends that it is barred from indemnifying Keenan for the amounts awarded in the Underlying Action or paid in settlement of Keenan's liability in the Underlying Action, and Keenan contends that Ironshore Indemnity (and the underlying insurers) are obligated to indemnify Keenan for such amounts.

32. Ironshore Indemnity desires a judicial determination that it is barred from indemnifying Keenan for amounts awarded against Keenan in the Underlying Action or paid in settlement.

## PRAYER

WHEREFORE, Ironshore Indemnity prays for judgment as follows:

1. For a declaration that Ironshore Indemnity is barred from indemnifying Keenan for compensatory damages awarded against Keenan in the Underlying Action, or for any settlement payment made to resolve Keenan's liability for compensatory damages awarded in the Underlying Action;

2. For a declaration that, in the absence of covered compensatory damages, Ironshore Indemnity is not obligated to indemnify Keenan for punitive damages awarded against Keenan in the Underlying Action or for any settlement payment made to resolve Keenan's liability for punitive damages awarded in the Underlying Action;

3. For recovery of its costs of suit herein; and

\\\

\\\

\\\

\\\

\\\

4. For such other relief as the Court herein deems just and proper.

Dated: April 15, 2025

NICOLAIDES FINK THORPE
MICHAELIDES SULLIVAN LLP

By: */s/ Matthew C. Lovell*
Matthew C. Lovell
B. Natalie Vu
Attorneys for Plaintiff IRONSHORE INDEMNITY INC.